Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 1 C 8440 | **DATE** | 10/9/2002 |
| **CASE TITLE** | George Tatz vs. Nanophase | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter MEMORANDUM, OPINION AND ORDER: The defendants' motion to dismiss pursuant [14-1] to Federal Rules of Civil Procedure 12(b)(5), Rule 9(b), and the Private Securities Litigations Reform Act of 1995 is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | OCT 0 9 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 18 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 OCT -9 PM 8:29 | | |
| TSA | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

GEORGE TATZ, individually and on behalf )
of all others similarly situated, )
)
)
Plaintiff, )
) No. 01 C 8440
v. )
) Wayne R. Andersen
NANOPHASE TECHNOLOGIES ) District Judge
CORPORATION and JOSEPH CROSS, )
)
Defendants. )

DOCKETED
OCT 0 9 2002

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the motion of the defendants, Nanophase Technologies Corp., Joseph Cross, Jess Jankowski, Daniel Bilicki, and Gina Kritchevsky, to dismiss the plaintiff's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6), Rule 9(b), and the Private Securities Litigation Reform Act of 1995. For the following reasons, the motion to dismiss is denied.

### BACKGROUND

The factual background recited below is taken from the plaintiff's amended complaint and the parties' briefs. Defendant Nanophase Technologies Corporation (hereinafter "Nanophase") is a Delaware Corporation, with headquarters in Romeoville, Illinois, that develops, manufacturers, and sells nanocrystalline materials for commercial use. Nanophase uses its extensive proprietary technology to engineer and produce nanocrystalline materials for specific applications, including environmental catalysts. Defendant Joseph Cross was at all

relevant times the Chief Executive Officer, president, and a director of Nanophase. The other individual defendants were, at all relevant times, senior executive officers of Nanophase.

On January 21, 2001, Cross told the *Wall Street Journal* that Nanophase had met each of the goals for the year 2000 and announced that the company's 2001 targets included "tripling revenues again." He stressed that Nanophase needed to "increase the revenue stream as quickly as possible," not only to become profitable but also to show that customers perceive that the company's technology has value. Shortly thereafter, Nanophase was notified by BASF, its largest customer, of an "unexpected delivery rescheduling for sunscreen materials." Under the new schedule, the company would ship product to BASF primarily in the third and fourth quarters, reducing shipments by 50% in the first quarter and 30% in the second quarter. According to the complaint, because Nanophase had already reduced its 2001 revenue forecast in February 2001, the defendants needed to find some way to replace the deferred BASF revenues.

Just before the close of the first quarter, on March 28, 2001, Nanophase issued a press release stating that Nanophase "received an order for approximately $400,000 for a new environmental catalyst application to be filled in the first quarter of 2001." While the company anticipated "significant" revenue in 2001 from this customer, quantities and timing would not be known for a few months. Also, for "competitive reasons," the customer was not named. As a result of this deal, Nanophase's release of first quarter results was positive. On April 5, 2001, Nanophase reported a 73% rise in revenues from the prior year and "robust" business development, "as evidenced by our recent announcement of a new customer for environmental catalyst."

2

Apparently as a result of shareholder confusion concerning the recording of the revenue from the new environmental catalyst sale, defendant Jankowski, the company's acting Chief Financial Officer, explained at the beginning of the April 26, 2001 conference call how the company was able to record the revenue in the first quarter. He stated:

> "... $400,000 of first quarter 2001 product revenue related to the catalyst order that we discussed in our March 28 press release. We had positive negotiations with that customer for some time prior to finalizing arrangements and were ready to fill the order immediately upon coming to terms. The timing of this revenue seems to have been a point of confusion to some of our shareholders."

Aside from accruing the revenue in the first quarter, which could only occur, according to the company's stated policy, if shipment had made been made, other defendants also suggested that the product had already been shipped. Specifically, Dan Bilicki, Vice President of Sales and Marketing, stated: "The nanocrystalline material <u>provided</u> will be used for large-scale tests." Similarly, Cross added, "[F]or the catalyst order . . ., we <u>also have deliveries scheduled</u> for the second quarter."

Based in large part on these announcements, Nanophase's stock price rose from $6.44 to $11.81 on May 18, 2001. That day, and again on May 22 and May 24, when the closing price ranged from $10.60 to $11.81, defendants Bilicki, Jankowski, and Gina Kritchevsky, Vice President of Technology and Engineering, sold 53,228 shares of stock, 33.3% of all shares traded on those days.

One week later, Nanophase terminated its exclusive relationship with the unnamed customer of the environmental catalyst, based upon "concerns that the customer is not currently adequately capitalized to fulfill its remaining obligations." The company lowered expected second quarter revenues by $500,000 and 2001 projections by $2-2.5 million. However, the

3

company never disclosed that it had not been paid for the first quarter sale. Nevertheless, this partial disclosure caused the stock price to drop $2.06, or 17.44%, on the next trading day (June 4, 2001), on the third highest trading day volume in the purported class period.

According to the amended complaint, shareholders' suspicions were again aroused by this announcement, especially as it came just days after three executives sold 53,000 shares of stock. During a July 26, 2001 conference call, defendants again explained their actions. Cross stated during the conference call that:

> "As many of you are aware, three Officers and one Director sold some stock this past quarter . . . [S]tock options are a form of compensation in this company. In each case, the Officers involved had personal reasons for their decisions, as is their right to manage their own compensation. While the timing turned out to be awkward, related to our decision to exit the relationship with the European customer, all the factors that led to that decision were not known until literally hours before the press release."

Regarding the termination of the agreement, Cross said that, although a memorandum of understanding had been executed setting forth quantities and delivery dates, the customer did not sign a "legal agreement" because it was "undercapitalized." Again, four months after the first quarter order had been filled, defendants did not disclose that the customer had not yet paid Nanophase. This partial disclosure still caused a price drop of 15%, from $7.74 on July 25 to $6.60 on July 26.

On October 25, 2001, Nanophase reversed the first quarter sale, reducing third quarter revenues from $1.1 million to $700,000. Revealing the customer's identity, Nanophase explained that not only had Celox failed to pay for the order, but Celox never gave shipping instructions to Nanophase, although it had been required to do so by July. Thus, even though Nanophase had "exit[ed] the relationship" with an "undercapitalized" Celox on June 1, 2001 and

4

had never sent Celox any product, defendants claimed that only on October 16, 2001 was "significant uncertainty" first raised as to whether Celox would "ever pay for the product it bought," and for which revenue was accrued seven months earlier. Consequently, the stock's price fell 13.5% the next day, from $6.20 to $5.36.

On November 2, 2001, the plaintiff filed a two count class action complaint against the defendants. On March 8, 2002, the plaintiff filed an amended complaint. Count I of the complaint alleges that the defendants violated Section 10(b) of the Securities Exchange Act of 1934 as well as Rule 10b-5 of the Code of Federal Regulations. Count II of the complaint alleges that the defendants violated Section 20(a) of the Securities Exchange Act of 1934.

## DISCUSSION

### I. Standard of Review

Defendants' motion to dismiss implicates the Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1). A motion to dismiss pursuant to Rule 12(b)(6) tests whether the plaintiff has stated a claim, not whether the plaintiff will prevail on the merits. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982). In deciding a motion to dismiss, the Court must assume all facts in the complaint to be true, construe the allegations liberally, and view the allegations in a light most favorable to the plaintiff. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). The Court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229 (1984).

Rule 9(b) requires plaintiffs to plead "the circumstances constituting fraud . . . with particularity." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). This means the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The stringent pleading requirement under Rule 9(b) serves three main purposes: "to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." *Chu v. Sabratek Corp.*, 100 F. Supp.2d 815, 819 (N.D. Ill. 2000).

In addition to the above legal standards, the PSLRA amendments to the Securities Exchange Act raise the pleading standards in securities fraud cases, requiring the plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA also requires the plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C.§ 78u-4(b)(1).

With these standards in mind, we take as true all well-pleaded facts of the complaint, but we will dismiss the claim if it fails to satisfy the heightened pleading requirements of Rule 9(b) or the PSLRA.

## II.    Elements Of A § 10b-5 Claim

The elements of a § 10b-5 claim are that: 1) the defendant made a false statement or omission; 2) of a material fact; 3) with scienter; 4) in connection with the purchase or sale of securities; 5) upon which the plaintiff justifiably relied; 6) and the false statement proximately caused the plaintiffs' damages. *Caremark, Inc.*, 113 F.3d at 648.

A.  False Statements and/or Omissions

In their motion, the defendants argue that the plaintiff has not sufficiently alleged that they made misrepresentations or omissions of fact in connection with the Celox sale. Specifically, the defendants assert that plaintiff's allegations "rest entirely on his conclusory assertion that the revenue from the Celox sale was improperly booked under GAAP and Nanophase's internal accounting standards . . . ." (Def. Motion to Dismiss Brief at 9.) We disagree.

As the plaintiff has very persuasively demonstrated in his response brief to the motion to dismiss, the amended complaint is replete with detailed allegations that numerous statements made by the defendants regarding the sale of the environmental catalyst to Celox were false and/or misleading when made. For example:

- Based upon the fact that no product was shipped in the first quarter of 2001, that Celox was a start-up company that would not be funded until Nanophase granted it an exclusive license and a sample was successfully tested, and that part of the purchase order was to be applied to a license fee, the company overstated product revenues by $400,680 and overstated the percentage increase in year-over-year first quarter revenues (73% instead of 8.6%) in the April 5 press release, April 26 conference call, and the May 15 10-Q for the first quarter. (Complt. at ¶43(a), (b), (d), (f); ¶44(a), (c), (d); ¶45(b), (d); ¶46; and ¶73(a)).

- Nanophase falsely represented and/or implied in statements made on March 28, April 5, and April 26, 2001 that the Celox order had been shipped. (Complt. at ¶43(c), (e), (g)).

- On April 5 and April 26, Nanophase failed to disclose that it planned to change its revenue recognition policy retroactive to January 1, 2001. (Complt. at ¶44(e) - (f)).

- When Nanophase announced the termination of the deal with Celox on June 1 and July 26, it falsely stated that the customer's undercapitalization was recently disclosed, that Celox had a product purchase commitment that it was unable to fulfill for the second quarter, and that a memorandum of understanding had been signed setting forth quantities and timing of purchases. (Complt. at ¶48; ¶50(b) - (d); ¶53(b); and ¶54).

7

- On June 1 and July 26, defendants failed to disclose the following material facts: 1) that there was no shipment to Celox in the first quarter; 2) that no payment was made by Celox; and 3) that Nanophase did not send a sample of the product to Celox for testing. (Complt. at ¶50(a) - (e)).

- On July 26, defendants again implied that the first quarter order had been shipped when Jankowski stated, with respect to the materials purchased for Celox, "our schedule to produce and ship the balance of it will be moved out into 2002." (Complt. at ¶53(a)).

- Nanophase falsely inflated its 6-month revenues by $400,680 in the Form 10-Q for the second quarter filed on August 13. (Complt. at ¶58).

(Pltf. Response Brief at 7-8).

Additionally, we find that the allegations raised in the complaint concerning the allegedly false statements made by the defendants satisfy the requirements of Rule 9(b) and the PSLRA. As we mentioned above, in order to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, a plaintiff must allege the who, what, where, when, and how of the alleged fraud. In this case, the plaintiff has done just that. The plaintiff has alleged that the purportedly false statements were made on April 5, April 26, May 15, June 1, July 26, and August 13. He has alleged that the statements were made during official conference calls in which the company's financial condition was discussed. He has alleged that false statements were communicated to the public through press releases and SEC filings. Furthermore, he has asserted with the requisite degree of particularity what was false about the different statements as well as why he believes they were false and/or misleading. Therefore, we find that the allegations contained in the plaintiff's amended complaint adequately assert that the defendants made false statements or omissions in connection with the recording of the revenue from the Celox sale.

B. <u>Materiality</u>

Whether a statement is material "depends on how it affects an investor's perception of the security. If the court determines that there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information, the statement is material." *Searls v. Glasser*, 64 F.3d 1061, 1065-1066 (7th Cir. 1995) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S.Ct. 978 (1988)). The issue is whether there is a "substantial likelihood that a reasonable shareholder would consider (them) important . . . ." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126 (1976). Materiality is normally a "contextual, fact-specific . . . inquiry," *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1333 (7th Cir. 1995), so it "is typically an issue to be resolved by the finder of fact." *Id.* (citing *TSC Indus.*, 426 U.S. at 450).

The defendants have argued in their motion that the statements identified by the plaintiff as false or misleading were also not material. In support of this argument, the defendants contend there was no recognizable reaction in the market to the initial announcement of the Celox sale on March 28 and the later announcement of its reversal. *See Anderson v. Abbott Lab.*, 140 F. Supp. 2d 894, 901 (N.D. Ill. 2001). Additionally, the defendants assert that a reasonable investor should have anticipated, after the June 1 press release indicating that the Celox sale would not be included in future revenue projections, that Celox could not pay for its previous order. We disagree with these arguments.

As the plaintiff correctly notes, with respect to the impact of the initial announcements of the sale of the environmental catalyst to an unnamed customer (later revealed as Celox), the market did respond positively to the news. In fact, the plaintiff alleges that Nanophase's stock

9

price rose by 4.8% on March 29, the day immediately following the press release announcing the Celox sale. Furthermore, following both the April 5 and April 26 statements, which touted the catalyst sale, the stock price rose 17% and 9% respectively, for a four-week increase of 58%. As we are required to accept these statements as true for purposes of this motion, we conclude that the plaintiff has sufficiently demonstrated that these representations by the defendants were material.

As for the defendants' argument that a reasonable investor should have anticipated that Celox would not ultimately pay for the first quarter order, we reject it because it is an inherently fact intensive assertion. At this point in the proceeding, we have no way of knowing whether a reasonable investor should or should not have anticipated that Celox would ultimately be unable to pay for the first quarter order. Instead, we must base our decision on the facts alleged in the amended complaint and draw all reasonable inferences in the plaintiff's favor. Accordingly, we conclude that the plaintiff has adequately pled that the defendants' allegedly false and misleading statements were material in that they had a substantial effect on how a reasonable investor would evaluate the financial condition of Nanophase.

C. <u>Scienter</u>

Scienter refers to a mental state embracing the intent to deceive, manipulate or defraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375 (1976). The Seventh Circuit has interpreted *Hochfelder* as establishing that "reckless disregard for the truth counts as intent" for the purpose of the § 10(b) scienter requirement. *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

The PSLRA amendments did not change the substantive provision of the Exchange Act's scienter requirement. Most courts which have construed the scienter requirement after the PSLRA have concluded that allegations of recklessness continue to be sufficient to state a claim under § 10(b). *See, e.g., Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815 (N.D. Ill. 2000); *In re Spyglass Inc. Sec. Litig.*, 1999 WL 543197, at *7 (N.D. Ill. July 21, 1999). "Reckless conduct is, at least, conduct which is highly unreasonable and which represents an extreme departure from standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Co.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997).

Under the PSLRA, a plaintiff alleging securities fraud must allege facts that afford "a strong inference" for believing that plaintiffs could prove scienter. As to the pleading requirements, there is a disagreement among the various Circuits. Although the Seventh Circuit has not yet ruled on this issue, several courts in this district have held that the PSLRA codified the standard enunciated by the Second Circuit. *See, e.g., Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 937 (N.D. Ill. 1999); *Chu*, 100 F. Supp. 2d at 822. Under the Second Circuit's test, a plaintiff may allege scienter by either: 1) showing that the defendants had both the motive and opportunity to commit fraud; or 2) establishing strong circumstantial evidence of conscious behavior or recklessness. *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). We believe that this is the correct standard. Therefore, we agree with Judge Castillo's clear enunciation in *Chu* that:

> the PSLRA's only requirement is that the facts alleged must give rise to a "strong inference" of the defendant's scienter. The *type* of facts with which a plaintiff pleads scienter factor little into our analysis, as long as the overall facts give rise to

11

> a "strong inference" of scienter. Thus, a plaintiff may use "motive and
> opportunity" or "circumstantial evidence" to establish scienter under the PSLRA,
> as long as those facts support a strong inference "that the defendant acted
> recklessly or knowingly."

*Chu*, 100 F. Supp. 2d at 823 (citations omitted). With these standards in mind, we will analyze the facts presented in the instant case to determine whether scienter is properly alleged.

The allegations in the amended complaint in this case create a strong inference that the defendants acted either intentionally or recklessly. The allegations establish the actionability of the allegedly materially misleading statements concerning the booking of the revenue from the first quarter Celox sale. As support for the claim of actionable knowledge or recklessness, the amended complaint alleges that: 1) certain of the individual defendants sold a substantial percentage of their Nanophase stock during a time when the stock was trading at its highest levels following the initial announcement of the Celox sale; 2) the defendants engaged in identical conduct which was already the subject of a prior lawsuit (i.e. a lawsuit filed after the company's 1997 initial public offering in which the plaintiffs alleged that the company inflated sales revenues by misrepresenting license fees as product fees and failed to disclose that a customer did not make purchases pursuant to a schedule set forth in the registration statement); 3) the defendants overstated revenue with an end-of-quarter sale; 4) the defendants used the words "filled" and "provided" to imply that products had been shipped when in fact they had not; 5) the defendants recognized revenue on a conditional sale despite the company's stated policy since the initial public offering to only record revenues once shipments had been made by the company; and 6) the defendants greatly inflated revenues in the first quarter by booking $400,680 in revenue despite the fact that Celox was unable to pay for the product.

We find that, in the amended complaint, the plaintiff has alleged motive and opportunity and other circumstantial evidence sufficient to establish scienter. The facts alleged support a "strong inference" that the defendants acted recklessly or knowingly. The third element of a Rule 10b-5 claim has been established.

D.     Reliance and Loss Causation

A Rule 10b-5 plaintiff must establish that the defendant's misrepresentation or omission in fact caused his injury. Accordingly, courts have required a plaintiff to demonstrate his reliance on the alleged misrepresentation or omission as an element of a 10b-5 action in order to establish this causal connection. *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439 (1994); *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978 (1988). In many securities fraud cases, such as this one, reliance is pled under the "fraud on the market" doctrine. Under this doctrine, the United States Supreme Court has held that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247. "The theme of *Basic* and other fraud-on-the-market decisions is that *public* information reaches professional investors, whose evaluations of that information and trades quickly influence securities prices." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002) (emphasis in original). Because the allegedly false and misleading statements described in the amended complaint were all publicly disseminated, the "fraud on the market" doctrine is applicable here. Thus, the reliance element is presumed to exist in this case.

Under Rule 10b-5, the plaintiffs must also plead both transaction causation and loss causation. *Caremark, Inc.*, 113 F.3d at 648 (citations omitted). To plead transaction causation,

13

the plaintiffs must allege that they would not have invested in the instrument if the defendants had stated truthfully the material facts at the time of the sale; to plead loss causation, the plaintiffs must allege that it was the very facts about which the defendants lied which caused their injuries. *Id.* The requirement is not a difficult one, and it "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Id.* at 649.

The defendants argue that the plaintiff has not demonstrated loss causation because, at the time he personally purchased shares of Nanophase stock on October 11, 2001, there is no evidence that the statement made on October 25 regarding the reversal of the $400,680 revenue from the Celox sale adversely affected the stock's price. The defendants' reading of the allegations in the amended complaint is much too narrow. Instead, drawing all reasonable inferences in his favor, it is clear that the plaintiff has pled loss causation. Rather than arguing that his loss was caused by the only statement made while he actually owned Nanophase stock, the plaintiff's causation argument rests on the premise that he and the other shareholders he seeks to represent purchased their stock at artificially inflated prices. The amended complaint alleges that these artificially inflated prices, and the losses the plaintiff subsequently suffered, are a direct result of the statements made by the defendants' from March 28 through October 25, 2001. *See Danis*, 73 F. Supp. 2d at 943. Therefore, we conclude that the plaintiff has adequately pled loss causation in his amended complaint. The motion to dismiss Count I is thus denied.

### III. Section 20(a) Claim

Section 20(a) of the Securities Exchange Act of 1934 is remedial, to be construed liberally, and requires only some indirect means of discipline or influence short of actual direction to hold a control person liable. *See Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir.

14

1992). To state a Section 20(a) claim, a plaintiff must allege: 1) a primary violation; 2) that the defendant exercised control over the operations of the primary violator; and 3) that the defendant possessed the power, whether or not exercised, to control the fraudulent activity. *See In re Westell Tech., Inc. Sec. Litig.*, 2001 WL 1313785, at *12 (N.D. Ill. Oct. 26, 2001).

The primary argument in the defendants' motion to dismiss the Section 20(a) count is that the plaintiff has failed to satisfy the first requirement - the presence of a primary violation. As discussed in detail above, we have concluded that this is not the case. Rather, the plaintiff has adequately pled a Rule 10b-5 cause of action against the defendants. Since the defendants have not challenged the remaining elements of the Section 20(a) count, we will deny the motion to dismiss Count II.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), Rule 9(b), and the Private Securities Litigations Reform Act of 1995 is denied.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: October 9, 2002

15