# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 1 C 8440 | **DATE** | 6/12/2003 |
| **CASE TITLE** | George Tatz vs. Nanophase Technologies | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, the plaintiff's motion for class certification pursuant to FRCP 23(b)(3) is granted. Mr. George Tatz is hereby appointed as class representative.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 1 3 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 46 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | TSA | 03 JUN 13 AM 8:29 | date mailed notice | |
| | courtroom deputy's initials | FILED-10 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE TATZ, individually and on behalf of all others similarly situated, ) ) ) Plaintiff, ) ) v. ) ) NANOPHASE TECHNOLOGIES ) CORPORATION, JOSEPH CROSS ) JESS JANKOWSKI, DANIEL S. BILICKI, ) and GINA KRITCHEVSKY, ) ) Defendants. ) | No. 01 C 8440<br><br>Wayne R. Andersen<br>District Judge |

DOCKETED
JUN 1 3 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, George Tatz, brings this putative class action on behalf of himself and those similarly situated against Defendants Nanophase Technologies Corp., Joseph Cross, Jess Jankowski, Daniel Bilicki, and Gina Kritchevsky. Plaintiff now moves for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3). For the following reasons, Tatz's motion for class certification is granted.

### BACKGROUND

The following factual history is taken from our prior opinion in this case denying the defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995. *See Tatz v. Nanophase Technologies Corp.*, 2002 WL 31269485, at *1-3 (N.D. Ill. Oct. 9, 2002).

Defendant Nanophase Technologies Corporation (hereinafter "Nanophase") is a Delaware Corporation, with headquarters in Romeoville, Illinois, that develops, manufacturers, and sells

nanocrystalline materials for commercial use. Nanophase uses its extensive proprietary technology to engineer and produce nanocrystalline materials for specific applications, including environmental catalysts. Defendant Joseph Cross was at all relevant times the Chief Executive Officer, president, and a director of Nanophase. The other individual defendants were, at all relevant times, senior executive officers of Nanophase.

On January 21, 2001, Cross told the *Wall Street Journal* that Nanophase had met each of the goals for the year 2000 and announced that the company's 2001 targets included "tripling revenues again." He stressed that Nanophase needed to "increase the revenue stream as quickly as possible," not only to become profitable but also to show that customers perceive that the company's technology has value. Shortly thereafter, Nanophase was notified by BASF, its largest customer, of an "unexpected delivery rescheduling for sunscreen materials." Under the new schedule, the company would ship product to BASF primarily in the third and fourth quarters, reducing shipments by 50% in the first quarter and 30% in the second quarter. According to the complaint, because Nanophase had already reduced its 2001 revenue forecast in February 2001, the defendants needed to find some way to replace the deferred BASF revenues.

Just before the close of the first quarter, on March 28, 2001, Nanophase issued a press release stating that Nanophase "received an order for approximately $400,000 for a new environmental catalyst application to be filled in the first quarter of 2001." While the company anticipated "significant" revenue in 2001 from this customer, quantities and timing would not be known for a few months. Also, for "competitive reasons," the customer was not named. As a result of this deal, Nanophase's release of first quarter results was positive. On April 5, 2001, Nanophase reported a 73% rise in revenues from the prior year and "robust" business

development, "as evidenced by our recent announcement of a new customer for environmental catalyst."

Apparently as a result of shareholder confusion concerning the recording of the revenue from the new environmental catalyst sale, defendant Jankowski, the company's acting Chief Financial Officer, explained at the beginning of the April 26, 2001 conference call how the company was able to record the revenue in the first quarter. He stated:

> ". . . $400,000 of first quarter 2001 product revenue related to the catalyst order that we discussed in our March 28 press release. We had positive negotiations with that customer for some time prior to finalizing arrangements and were ready to fill the order immediately upon coming to terms. The timing of this revenue seems to have been a point of confusion to some of our shareholders."

Aside from accruing the revenue in the first quarter, which could only occur, according to the company's stated policy, if shipment had made been made, other defendants also suggested that the product had already been shipped. Specifically, Dan Bilicki, Vice President of Sales and Marketing, stated: "The nanocrystalline material provided will be used for large-scale tests." Similarly, Cross added, "[F]or the catalyst order . . ., we also have deliveries scheduled for the second quarter."

Based in large part on these announcements, Nanophase's stock price rose from $6.44 to $11.81 on May 18, 2001. That day, and again on May 22 and May 24, when the closing price ranged from $10.60 to $11.81, defendants Bilicki, Jankowski, and Gina Kritchevsky, Vice President of Technology and Engineering, sold 53,228 shares of stock, 33.3% of all shares traded on those days.

One week later, Nanophase terminated its exclusive relationship with the unnamed customer of the environmental catalyst, based upon "concerns that the customer is not currently

3

adequately capitalized to fulfill its remaining obligations." The company lowered expected second quarter revenues by $500,000 and 2001 projections by $2-2.5 million. However, the company never disclosed that it had not been paid for the first quarter sale. Nevertheless, this partial disclosure caused the stock price to drop $2.06, or 17.44%, on the next trading day (June 4, 2001), on the third highest trading day volume in the purported class period.

According to the amended complaint, shareholders' suspicions were again aroused by this announcement, especially as it came just days after three executives sold 53,000 shares of stock. During a July 26, 2001 conference call, defendants again explained their actions. Cross stated during the conference call that:

> "As many of you are aware, three Officers and one Director sold some stock this past quarter . . . [S]tock options are a form of compensation in this company. In each case, the Officers involved had personal reasons for their decisions, as is their right to manage their own compensation. While the timing turned out to be awkward, related to our decision to exit the relationship with the European customer, all the factors that led to that decision were not known until literally hours before the press release."

Regarding the termination of the agreement, Cross said that, although a memorandum of understanding had been executed setting forth quantities and delivery dates, the customer did not sign a "legal agreement" because it was "undercapitalized." Again, four months after the first quarter order had been filled, defendants still had not disclosed that the customer had not yet paid Nanophase. This partial disclosure still caused a price drop of 15%, from $7.74 on July 25 to $6.60 on July 26.

On October 25, 2001, Nanophase reversed the first quarter sale, reducing third quarter revenues from $1.1 million to $700,000. Revealing the customer's identity, Nanophase explained that not only had Celox failed to pay for the order, but Celox never gave shipping

4

instructions to Nanophase, although it had been required to do so by July. Thus, even though Nanophase had "exit[ed] the relationship" with an "undercapitalized" Celox on June 1, 2001 and had never sent Celox any product, defendants claimed that only on October 16, 2001 was "significant uncertainty" first raised as to whether Celox would "ever pay for the product it bought," and for which revenue was accrued seven months earlier. Consequently, the stock's price fell 13.5% the next day, from $6.20 to $5.36.

On March 8, 2002, the plaintiff filed an amended two count complaint against the defendants alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Code of Federal Regulations. By order dated January 29, 2002, Tatz was appointed Lead Plaintiff and his counsel, Glancy & Binkow LLP, was appointed Lead Counsel for the class. In the instant motion, the plaintiff requests that we certify a class defined as follows:

> All persons or entities who purchased or acquired Nanophase Technologies Corporation ("Nanophase" or "Corporation") common stock during the period from April 5, 2001, through and including October 24, 2001 (the "Class Period"), and were damaged thereby. Excluded from the class are the defendants, their affiliates and any officers or directors of Nanophase or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class").

## DISCUSSION

### I. Class Certification is Particularly Appropriate in Securities Cases

The Seventh Circuit Court of Appeals has liberally construed Rule 23 in shareholder suits. *See King v. Kansas City Southern Industries, Inc.*, 519 F.2d 20, 25-26 (7th Cir. 1975). Courts in this district recognize that:

5

> securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing.

*Gilbert v. First Alert, Inc.*, 904 F. Supp. 714, 719 (N.D. Ill. 1995) (quoting *Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas.) Ltd.*, 94 F.R.D. 147, 150 (N.D. Ill. 1982)), *opinion amended on other grounds*, 165 F.R.D. 81 (1996). A class action is often the most fair and practicable means to address claims in securities cases. *Brosious v. Children Place Retail Stores,* 189 F.R.D. 138, 147 (D.N.J. 1999) ("[c]lass actions are often the most fair and practical vehicle for plaintiffs' claims in securities suits because 'those who have been injured are in a poor position to seek legal redress' . . . because individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation") (quoting *Zinberg v. Washington Bancorp. Inc.*, 138 F.R.D. 397, 410 (D.N.J. 1990)). *See also Endo v. Albertine*, 147 F.R.D. 164 (N.D. Ill. 1993) (certifying plaintiff class under § 11 of the 1933 Act).

## II. The Requirements of Rule 23(a)

A party seeking to represent a class of similarly situated individuals has the burden of establishing that class certification is proper under Federal Rule of Civil Procedure 23. *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). The Court must determine the propriety of class certification with reference to the requirements of Rule 23 and not to whether the plaintiff will ultimately prevail on the merits of his claim. "[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140 (1974). However, the Court may look

beyond the pleadings to determine whether the requirements of Rule 23 have been met. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001). The Court must "understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of certification issues." *Dhamer v. Bristol- Myers Squibb Co.*, 183 F.R.D. 520, 530 (N.D. Ill. 1998).

In determining whether class certification is proper under Rule 23, the Court must undertake a two-step analysis. The Court must first determine whether the initial requisites for class certification delineated in Rule 23(a) are satisfied: (1) that the class is so numerous that joinder of all members is impracticable (numerosity); (2) that there are questions of law or fact common to the class (commonality); (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) that the representative parties will fairly and adequately protect the interests of the class (adequacy of representation). Second, the Court must determine whether the proposed class satisfies one of the sub-parts of Rule 23(b). In this case, Tatz seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). With these principles in mind, we turn to whether Tatz has satisfied the requirements under Rule 23 for class certification.

### A. The Effect of Defendants' Offer of Judgment

In its opposition to the motion for class certification, the defendants argue that the motion should be denied because Tatz's claims are moot because of an offer of judgment. The substance of this argument is that since the defendants offered, in a Rule 68 offer of judgment, the full

7

amount of damages Tatz could recover if he prevails on the merits, all of Tatz's claims as a putative class representative are moot. Thus, according to the defendants, the class certification motion should be denied. We disagree.

The relevant portions of Rule 68 provide that "[a]n offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs." Fed.R.Civ.P. 68. It is clear from the text of this rule that its terms are not self-executing. It is within the discretion of the party to whom the offer of judgment is made to accept the offer or not within 10 days. The record in this case is clear that Tatz did not respond to the offer of judgment within the requisite time period. Thus, Tatz's claims technically are not moot because no offer has been accepted and recorded with the Clerk of this Court.

Further, the Seventh Circuit has addressed the impact of an offer of judgment on class certification in cases such as this. In *Greisz v. Household Bank (Illinois), N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999), the court found that an offer of judgment made before a class is certified is not sufficient to moot the class representative's claim because "an offer to one is not an offer of the *entire* relief sought by the suit . . . ." (Emphasis in original) (citing *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 341, 100 S.Ct. 1166 (1980); *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1539 (8th Cir. 1996)). The court also noted that an offer of judgment may moot a plaintiff's claim if it was made prior to a motion for class certification and "before the existence of other potential plaintiffs has been announced." *Id.* (citing *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994)). While it is true that the defendants made the offer of judgment to Tatz two months before the instant motion for class certification was filed, it cannot be denied that "the existence of other potential plaintiffs" had been announced. *Id.*

8

Plaintiff's counsel performed this function by not only filing a class action complaint which specifically contemplated the existence of hundreds of plaintiffs but also by persuading this Court to enter an order appointing Tatz as lead class plaintiff - a clear message to those interested in such things that a class certification motion would be filed forthwith. Thus, we find that the offer of judgment has not mooted Tatz's claims.

**B.    Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all class members is impracticable." Fed.R.Civ.P. 23(a)(1). Because there is no mystical number at which the numerosity requirement is established, courts have found this element satisfied when the putative class consists of as few as 10 to 40 members. *See Markham v. White*, 171 F.R.D. 217, 221 (N.D. Ill. 1997) (35-40 class members); *Hendricks-Robinson v. Excel Corp.*, 164 F.R.D. 667, 671 (C.D. Ill. 1996) (38 class members); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1983) (29 class members). Although the plaintiff need not allege the exact number or identity of the class members, the plaintiff ordinarily "must show some evidence or reasonable estimate of the number of class members." *Long v. Thornton Township High Sch. Dist.*, 82 F.R.D. 186, 189 (N.D. Ill. 1979). The Court is permitted to "make common sense assumptions in order to find support for numerosity." *Cannon v. Nationwide Acceptance Corp.*, 1997 WL 139472, at *2 (N.D. Ill. March 25, 1997) (quoting *Evans v. United States Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983)).

Here, the putative class contains hundreds of potential persons or entities. Some 13,000,000 shares of Nanophase's common stock were publicly traded on the NASDAQ National Market during the Class Period. It is reasonable to conclude, and no one seriously

9

contends otherwise, that these 13,000,000 shares were likely owned by hundreds of persons or entities throughout the United States. Thus, the numerosity requirement is satisfied.

In addition, Rule 23(a)(1) provides that a class action may be maintained only if "joinder of all members is impracticable." To demonstrate that joinder is impracticable, the class representatives "only need to show that it is extremely difficult or inconvenient to join all members of the class." C.A. Wright, A. Miller & N. Kane, FEDERAL PRACTICE AND PROCEDURE, § 1762 at 159 (2d ed. 1986). In this case, it would be extremely difficult to join the hundreds of members of the class.

### C.  Commonality

Rule 23(a)(2) requires that there be a common question of law or fact among class members. This Court has characterized the commonality requirement as a "low hurdle, easily surmounted." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992)(citing *Wesley v. General Motors Acceptance Corp.*, 1992 WL 57948, at *3 (N.D. Ill. 1992)). Common questions exist when, despite the existence of individual issues among class members, there is a common nucleus of operative facts. *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992); *Beale v. Edgemark Financial Corp.*, 164 F.R.D. 649, 654 (N.D. Ill. 1995). This element is satisfied when each class member's claim hinges on the same conduct by the defendants. *Beale*, 164 F.R.D. at 658.

The present case involves several common questions that relate to the defendants' conduct including, but not limited to: 1) whether the federal securities law were violated by the defendants' acts and omissions; 2) whether the defendants participated in and pursued the common course of conduct; 3) whether financial statements, audit reports, press releases, and

other statements disseminated to the investing public and Nanophase's shareholders omitted to state and/or misrepresented material facts about the business, products, financial condition, and business prospects of Nanophase; 4) whether the defendants acted willfully, knowingly, or recklessly; and 5) whether the market price of Nanophase's common stock was artificially inflated due to the alleged conduct by the defendants. Therefore, the commonality requirement of Rule 23(a)(2) is satisfied.

**D.  Typicality**

The typicality requirement of Rule 23(a)(3) requires the Court to determine whether the representative plaintiff's claims have the same essential characteristics as the claims of the class at large. *De la Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). *See also Beale*, 164 F.R.D. at 654. A finding that commonality exists generally results in a finding that typicality also exists. *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 164 F.R.D. 659, 664 (N.D. Ill. 1996). The Rule does not require that each member of a class suffer exactly the same injury as the named class representative. *Tidwell v. Schweiker*, 677 F.2d 560, 586 (7th Cir. 1982). Even when factual differences exist, similarity of legal theory satisfies the requirement. *See De la Fuente*, 713 F.2d at 232-33.

In their opposition to the class certification motion, the defendants have argued that this Rule 23(a) requirement has not been met because Tatz is subject to unique defenses which make him serving as class representative inappropriate. Specifically, the defendants contend that Tatz cannot prove that he individually relied on the allegedly fraudulent misrepresentations of the defendants. Obviously, Tatz disagrees with this argument and he contends that he need not prove individual reliance in this case because he is entitled to the "fraud on the market" presumption.

11

To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must ordinarily show that he relied on a material misstatement or omission in purchasing a security. *See In re HealthCare Compare Corp. Sec. Lit.*, 75 F.3d 276, 280 (7th Cir. 1996). However, the "fraud on the market" theory of reliance permits a plaintiff to pursue a Section 10(b)/Rule 10b-5 claim without showing direct reliance on the misstatement or omission; indirect reliance may be presumed. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978 (1988). The theory holds that efficient trading markets automatically establish a causal link between material misstatements or omissions and a stock purchaser's injury, and manifest that link in the stock's price. *See Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129 (7th Cir. 1993).

The defendants argue that the "fraud on the market" presumption should not apply because shares of Nanophase were not sold in an open, developed, and efficient securities market. While the Seventh Circuit has not formally done so, numerous courts have adopted the following five factors (the so-called *Cammer* factors) to aid in the determination of market efficiency: 1) whether the stock trades at a high weekly volume; 2) whether securities analysts follow and report on the stock; 3) whether the stock has market makers and arbitrageurs; 4) whether the company is eligible to file SEC registration form S-3, as opposed to form S-1 or S-2; and 5) whether there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *See, e.g., Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999); *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992); *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

In this case, the plaintiff has submitted a declaration as part of his class certification motion which, in our estimation, establishes that the market for Nanophase's share was open and

efficient. Specifically, the declaration states that: 1) during the Class Period, Nanophase stock had a trading volume of nearly nine million share with a total dollar trading volume of $72.08 million; 2) Nanophase stock was addressed in written reports by securities analyst Robinson Humphrey and conference calls during the Class Period were monitored by sell-side analysts from, at least, Robinson Humphrey, Merrill Lynch, Morgan Stanley, Tucker Anthony and CIBC World Markets, and by buy-side analysts from, at least, Target Capital Management and NWQ Investment Management; 3) 11% to 13% of the total outstanding common stock of Nanophase was held by numerous large institutional investors during the Class Period, including mutual funds, insurance companies, pension plans, banks, and other professional investors who manage equity portfolios in excess of $100 million; 4) Nanophase was eligible to file a Form S-3 during the Class Period and did later file a Form S-3 on June 12, 2002, and an amended Form S-3/a on September 6, 2002; and 5) the market did react to unexpected news released during the course of and just after the Class Period (i.e. statistically significant price changes to Nanophase's stock price on at least April 5, 2001, June 4, 2001, June 25, 2001, July 26, 2001, October 3, 2001, and October 25, 2001). (Declaration of Michael Marek, at ¶¶ 24-26, 30-31, 33, 41, 46-57.) Based on this declaration, we conclude that the market for Nanophase stock was open and efficient. Accordingly, we find that the "fraud on the market" presumption is appropriate in this case.

In addition to their market efficiency argument, the defendants also attack the typicality requirement by suggesting that Tatz's securities trading practices have left him open to unique reliance defenses. We disagree. As a general matter, we must remind the defendants that a plaintiff's claim is typical under Rule 23(a)(3) "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are

based on the same legal theory." *Rosario*, 963 F.2d at 1018; *De La Fuente*, 713 F.3d at 232. Tatz's Section 10(b) claims are typical of those of the class because he has alleged that he, like the class he purports to represent, relied to his detriment on the defendants' misrepresentations concerning Nanophase's business relationship with Celox. The fact that Tatz "may have used somewhat distinctive buying strategies does not render him atypical with respect to this claim of overarching fraud." *Danis v. USN Communications, Inc.*, 189 F.R.D. 391, 397 (N.D. Ill. 1999); *see also Gilbert*, 904 F. Supp. at 720; *Ridings*, 94 F.R.D. at 152. Therefore, we find that Rule 23(a)(3) has been satisfied.

### E.    Adequacy of the Representation

To satisfy the adequacy of representation requirement, a plaintiff must show that: 1) the proposed representative does not have "antagonistic or conflicting claims with other members of the class;" 2) the proposed representative has "sufficient interest in the outcome of the case to ensure vigorous advocacy;" and 3) its counsel is "competent, qualified, experienced and able to vigorously conduct the litigation." *Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999) (citation omitted). "Basic consideration[s] of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representative at all stages of the litigation where absent members will be bound by the court's judgment." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 89-90 (7th Cir. 1977). "[A] court must in the broadest sense be satisfied that the fiduciary duties and responsibilities of the class representative and class counsel will be conscientiously, fairly, and justly discharged in order to protect the interests of the class." *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D. Mich. 1994).

In their opposition to the motion for class certification, the defendants have primarily argued that the adequacy of representation requirement has not been satisfied through a variety of *ad hominem* attacks on Tatz. Specifically, the defendants contend that Tatz is not an adequate class representative because he supposedly lacks even basic knowledge and understanding of the case, he is only a sop for his class action attorneys, and he lacks the personal credibility necessary to properly represent the class. We disagree with the defendants' characterization of Tatz's potential representation of this putative class.

It is clear from the transcript of Tatz's deposition that he is fully aware and in control of this litigation. He indicated that he understood that he was bringing the suit on behalf of individuals like himself who allegedly were harmed when they relied on the purported misstatements and omissions of the defendants regarding the financial condition of Nanophase. He also established during his deposition that he was the individual who was primarily responsible for overseeing not only the progress of the lawsuit but also the actions of class counsel. Based on what we have seen in the pleadings, we are confident that Tatz has no interests with respect to this litigation that conflict with, or are antagonistic to, the interests of absent class members and that he will vigorously prosecute this action on behalf of the class. With respect to the defendants' somewhat spurious argument that Tatz lacks the necessary credibility to represent the class, we trust that the plaintiff is an upstanding individual who will do his best to make sure the best interests of the class are properly represented and protected.

## III. The Requirements of Rule 23(b)(3)

The proposed class also satisfies the requirements of Rule 23(b)(3) which provides:

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Each of these requirements is met in this case.

### A. Common Questions Predominate

While common questions of law or fact must predominate, they need not be exclusive. *Scholes v. Moore*, 150 F.R.D. 133, 138 (N.D. Ill. 1993). To determine whether common questions predominate, courts look to whether there is a "common nucleus of operative facts." *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 535 (N.D. Ill. 1995) (citing *Rosario*, 963 F.2d at 1018). A court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate. *See Beale*, 164 F.R.D. at 658.

The defendants' alleged misstatements and omissions of material fact to members of the class are at the core of the complaint. The issues of law and fact that flow from the defendants' alleged misstatements and omissions predominate over any individual issue. Because the many common issues will unquestionably dominate this Court's attention, common questions of law and fact predominate. *Id. See also Rosario*, 963 F.2d at 1018 ("[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement") (citing *Franklin v. City of Chicago*, 102 F.R.D. 944, 949-50 (N.D. Ill. 1984)); *Scholes*, 150 F.R.D. at 138 (finding predominance of common issues notwithstanding variance in material information)

### B. A Class Action is Superior

A class action in this case is superior to other means of adjudication for several reasons. First, there is a common core of law and fact pertaining to the defendants' alleged misstatements and omissions in connection with its allegedly improper accounting of the Celox sale. Accordingly, class treatment is a more efficient means of adjudicating this matter than the myriad individual suits that potentially could be filed in the absence of class certification. *See Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 105 F.R.D. 506, 508 (S.D. Ohio 1985). *See also Research Corp. v. Pfister Associated Growers, Inc.*, 301 F. Supp. 497, 503 (N.D. Ill. 1969). Indeed, any alternative to this class action could create duplication of actions, the very "evil that Rule 23 was designed to prevent." *Califano v. Yamasaki*, 442 U.S. 682, 690, 99 S.Ct. 2545 (1979). Such "[s]eparate actions by each of the class members would be repetitive, wasteful and an extraordinary burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983).

Second, class members will benefit from class treatment because litigation costs are high and it is, therefore, unlikely shareholders will prosecute individual claims. *See Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164-65 (7th Cir. 1974). A class action is a superior means to adjudicate claims of class members who would be overwhelmed by the defendants' resources if they attempted to prosecute their individual claims. *See Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302, 310 (N.D. Ill. 1995); *Alexander v. Centrafarm Group, N.V.*, 124 F.R.D. 178, 185 (N.D. Ill. 1988).

Third, principles of judicial economy and efficiency favor trying this case in one action rather than forcing class members to litigate identical claims individually. *See Scholes*, 143 F.R.D. at 189 ("judicial economy and efficiency, as well as consistent judgments, are achieved by

certifying the class"). Under these circumstances, class certification is the best way to manage this situation which could otherwise disintegrate into piecemeal adjudication of many individual actions involving essentially identical questions of law and fact.

Finally, this matter does not present significant management problems. Rule 23 was designed for this exact type of case. In this case, there is no realistic alternative to class action treatment.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) is granted. Mr. George Tatz is hereby appointed as class representative. The following class is certified:

> All persons or entities who purchased or acquired Nanophase Technologies Corporation ("Nanophase" or "Corporation") common stock during the period from April 5, 2001, through and including October 24, 2001 (the "Class Period"), and were damaged thereby. Excluded from the class are the defendants, their affiliates and any officers or directors of Nanophase or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class).

It is so ordered.

/s/ Wayne R. Andersen
Wayne R. Andersen
United States District Judge

Dated: June 12, 2003